**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DEBRA L. CROCKETT,**

          **Plaintiff,**

**v.**                                     **CASE NO. 3:09-cv-01281**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

          **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The case is presently pending before the Court on the parties' cross-motions for judgment on the pleadings. (Docket Nos. 13 and 15).

The undersigned United States Magistrate Judge has fully considered the evidence and the arguments of counsel.  For the reasons set forth below, the undersigned proposes and recommends that the United States District Judge find that the decision of the Commissioner is not supported by substantial evidence and should be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    Procedural History

Plaintiff, Debra L. Crockett (hereinafter "Claimant"), applied for SSI benefits on two occasions, including the instant matter.  According to the record, Claimant filed her first application on January 3, 2003, and that application was denied on June 24, 2003. (Tr. at 18).  She did not seek reconsideration of the denial; instead, she protectively filed a second application on May 3, 2004, alleging a disability onset date of April 15, 1996. (*Id.*).  Her alleged disabilities included memory impairment; left ankle problems; left knee damage; extensive muscle and nerve damage in her back, with degeneration and herniated discs; chronic pain; and panic and anxiety attacks. (Tr. at 97). This application was denied initially and upon reconsideration.   Claimant timely requested an administrative hearing, which was held on April 2, 2007 before the Honorable Algernon W. Tinsley, Administrative Law Judge ("ALJ").  (*Id.*).

The ALJ found no evidentiary basis to reopen Claimant's prior application and applied the doctrine of *res judicata* to the time period between Claimant's alleged disability onset date and June 24, 2003, the date on which the denial of her first application became administratively final.  Accordingly, the ALJ modified Claimant's disability onset date alleged in her second application to June 25, 2003.[1]   (*Id.*). Claimant does not contest this modification of the disability onset date; therefore, the time frame at issue in this case is June 25, 2003 through May 16, 2007, the date on which the ALJ issued his decision finding that Claimant was not under a disability.  (Tr. at 18-28).   The ALJ's decision became the final decision of the Commissioner on

---

[1] The ALJ's decision erroneously lists the date as June 25, 1995; however, it is clear from the discussion that he intended to modify the date to June 25, 2003, one day after the denial of the first application.

September 21, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 8-10).

On November 24, 2009, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed his Answer on March 3, 2010. (Docket No. 9). The parties filed their briefs in support of judgment on the pleadings on June 14, 2010 and July 13, 2010. (Docket Nos. 13 and 15).  Therefore, this matter is ripe for resolution by the Court.

## II.    **Summary of Findings by the ALJ**

Under 42 U.S.C. §§ 423(d)(5) and 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. § *Id.* 416.920(a).

The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, the second inquiry is whether claimant suffers from a severe impairment. *Id.* § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is

whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(e).

By satisfying inquiry four, the claimant establishes a prima facie case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is

more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the supportive medical findings, along with the impairment's rating, degree, and attendant functional limitations, to the criteria of the most similar listed mental disorder to determine if the severe impairment meets or equals the listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520a(d)(3).

In this particular case, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged disability onset date.[2] (Tr. at 20, Finding No. 2). Under the second inquiry, and using the special technique, the ALJ found that Claimant suffered from the following medically determinable, severe impairments: "back pain, osteoarthritis, carpal tunnel syndrome, hernia, Panic Disorder, and rule out Bipolar Disorder." (Tr. at 20-22, Finding No. 2). At the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 22-23, Finding No. 4).

The ALJ then found that Claimant had the residual functional capacity to "lift/carry 20 pounds occasionally and 10 pounds frequently; occasionally climb, balance, stoop, crawl, kneel, and crouch; avoid extreme temperatures and hazards; and

---

[2] The onset date for purposes of this application is June 25, 3003, not April 15, 1996, as stated by the ALJ in his decision.

requires low stress work environment." (Tr. at 23-27, Finding No. 4). As a result, Claimant was unable to return to her past relevant work as a waitress/server and elderly caregiver, classified as light, semi-skilled worked and medium to heavy, semi-skilled work, respectively. (Tr. at 27, Finding No. 5).

The ALJ considered that Claimant was defined as a younger individual, that she had at least a high school education and could communicate in English. The ALJ noted that transferability of job skills was not material to the determination of disability, because the Medical-Vocational Rules supported a finding of "not disabled." (Tr. at 27, Finding Nos. 6, 7, and 8). Relying upon the testimony of the vocational expert, the ALJ determined that Claimant could perform jobs such as laundry worker, office cleaner, clerical worker, and machine tender, all of which existed in significant numbers in the national economy. (Tr. at 27-28, Finding No. 9). Accordingly, Claimant was not under a disability as defined in the Social Security Act and, therefore, was not entitled to benefits. (Tr. at 28, Finding No. 10).[3]

## III.   Scope of Review

The issues before the Court are whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson*, 483 F.2d 773 (4th Cir. 1972) the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than preponderance.  If there is evidence to

---

[3] Once again, the modified disability onset date is June 25, 2003, which is the relevant date for this determination.

justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, *supra at* 776, quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id*. However, the Court must not abdicate its "traditional function" or "escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The Court must decide "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001).

Even given the limited scope of review, a careful examination of the record reveals that the ALJ failed to properly consider, and explain the weight given to, the opinions of Claimant's treating mental health care providers in contravention of the governing social security regulations. Consequently, the Commissioner's decision is not supported by substantial evidence.

## IV.   **Claimant's Background**

Claimant was 47 years old at the time of the administrative hearing. (Tr. at 853). She completed the eighth grade and then, at her mother's request, left school to work. (Tr. at 855). She later obtained her GED and started a data entry training program, which she never finished due to personal problems. (Tr. at 856). Claimant could read, write, and speak English and perform simple mathematical calculations. (*Id.*). Her prior

employment positions included waitress/server and elderly caregiver.  (Tr. at 98).   She had not engaged in gainful employment since 1996.  (Tr. at 857).

## V.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the ALJ erred by (1) failing to consider, and then articulate the weight given to, the opinions of Claimant's treating mental health physician in violation of 20 C.F.R. § 404.1527(d)(2), SSR 96-2p and SSR 96-8p;[4] and (2) failing to properly assess her credibility pursuant to SSR 96-7p. (Pl. Br. at 11-18).   Claimant contends that either one of these errors provides a sufficient basis to remand the case under sentence four of 42 U.S.C. § 405(g).

To the contrary, the Commissioner argues that the final decision, which found that Claimant was not disabled, is supported by substantial evidence.    The Commissioner maintains that the ALJ (1) adequately addressed the opinion evidence in the record; and (2) was appropriately skeptical of Claimant's credibility in view of ample evidence detailing her drug-seeking behavior, which was excessive and out of proportion to any legitimate medical findings. (Def. Br. at 15-20).

## VI.    **The Medical Record**

The Transcript of Proceedings (Docket No. 10) has been reviewed in its entirety. However, because the undersigned recommends remand on the limited issue of the ALJ's treatment of mental health care opinions, only those records will be discussed in any detail.  The remaining records, which are voluminous and span the time period of 1996 through 2007, can be summarized as follows:

---

[4] Claimant includes two prongs to this argument, but the undersigned will address them together.

## A.      Musculoskeletal and Non-severe Impairments

Claimant's musculoskeletal impairments originated with a work-related accident in 1996.  (Tr. at 857, 862-864).  According to Claimant, on April 15, 1996, while working as a waitress at Shoney's Restaurant, she slipped on a wet floor, broke her ankle, and herniated a disc in her back.  (*Id.*).  She went to the Emergency Department, where the ankle fracture was misdiagnosed as a sprain.  She continued to work on her feet for the next five months until her ankle was "destroyed."  (*Id.*).  Ultimately, the fracture was diagnosed, and Claimant began treatment with Dr. Charles Markham, a podiatrist.  (Tr. at 274-314).  Claimant underwent surgical repair in May 1997.  (Tr. at 212).  Post-operatively, Claimant continued to have pain and inflammation in her ankle.  (Tr. at 212, 274-314*)*.  She followed up regularly with Dr. Markham, receiving injections and physical therapy.  (*Id.*).

In 1998, Claimant underwent a second surgery to repair joint effusions and an osteochondral defect in her ankle.  (Tr. 212-214).  This procedure was not entirely successful.  Claimant continued to report pain and instability of her left ankle.  (Tr. at 220).  She also reported disc herniation, carpal tunnel symptoms, chronic pain in her left knee, fibromyalgia, asthma, migraine headaches, and anxiety and panic attacks.  (*Id.*).   Dr. Markham diagnosed her with chronic ankle synovitis with osteochondral defect.  (Tr. at 288).  In July 1999, Dr. Markham performed an ankle arthroscopy at Claimant's request and debrided some cartilage.  (Tr. at 287, 223).  He noted in an office record dated July 9, 1999 that he reluctantly provided Claimant with narcotic pain medication, "as she is a known substance abuser and drug seeker."  (Tr. at 284).

Claimant continued to treat with Dr. Markham until February 2001, by which time he had recommended that Claimant see an orthopedist for an ankle fusion and a

pain specialist for chronic pain management. (Tr. at 274-276). During Claimant's period of treatment with Dr. Markham, she also consulted with Dr. David Weinsweig, a neurosurgeon, for back pain.  Dr. Weinsweig ordered nerve conduction studies, which were essentially normal, and subsequently diagnosed by MRI a small right-sided disc herniation at the L4-5.  (Tr. at 264-266).  He did not recommend surgical intervention. (Tr. at 261, 264).  Instead, he referred her to The Center for Pain Relief at St. Mary's. (*Id.*). Concurrent with her treatment by these specialists, Claimant frequently presented to local emergency rooms seeking examination and pain medication.[5]  (*See, e.g.* Tr. at 226, 228, 231, 237, 369, 372, 376).

On April 3, 2001, Claimant was admitted to St. Mary's Medical Center ("SMMC") for right upper quadrant pain related to gallstones.  (Tr. at 805-806).  She underwent a gallbladder removal performed by Dr. Douglas Henson, a local surgeon.  (Tr. at 804). She was discharged on April 5, 2001 in stable condition.  (Tr. at 803).  On April 14, 2001, she returned to SMMC, again complaining of upper quadrant pain.  (Tr. at 795-796).  A consulting physician, who ultimately admitted Claimant to the services of Dr. Henson, documented that Claimant was "well-known to the Surgical Service for her narcotic seeking activities including directly causing abscesses on her lower extremities. . ." (*Id.*).  An abdominal film, CT scan, and EGD revealed no abnormalities. (Tr. at 791, 797).  She was discharged home on OxyContin.  (Tr. at 791).

Claimant returned on May 8, 2001 with similar complaints of abdominal pain. The admitting physician described her as a "well known drug seeker."  (Tr. at 787).  The

---

[5] In 2000, Claimant also had a series of ED visits related to bites from "brown recluse spiders" and secondary abscesses.  (Tr. at 241-259).

Pain Center was consulted, as was Claimant's family physician, Dr. David Ayers. (*Id.*).
Dr. Kellee Abner evaluated Claimant on behalf of The Pain Center, assessing her with a
history of "chronic pain pattern with psychosocial overlie." (Tr. at 784-785). Dr. Abner
noted that Claimant had treated in the past with two pain management specialists from
The Pain Center and "was not felt to be a candidate for any treatment through the pain
clinic." (*Id.*). Dr. Abner added that "because of her prior history, I did not feel
comfortable offering this patient any narcotics or opiods at this time." (*Id.*). Dr. Ayers
similarly documented Claimant's history of drug-seeking, recommending that she
undergo narcotic withdrawal. (Tr. at 782-783). He suggested tapering Claimant's
Xanax; transferring her to a facility to "dry out;" obtaining a psychiatric consultation;
and considering the use of Clonidine to assist with her withdrawal. (*Id.*).

In November 2001, Claimant underwent a left ankle fusion performed by Dr.
Gerald Shute, an orthopedist at the Holzer Clinic. (Tr. at 395). Although the surgery
appeared to go well, Claimant continued to complain of pain. (Tr. at 383-395). On
April 4, 2002, Dr. Shute told Claimant that she would need to consult with a pain
management specialist for her ankle pain, because there were no further surgical
options available to her. (Tr. at 384). In July 2002, Dr. Shute told her she had reached
maximum medical improvement with her ankle and would need to start seeing "a pain
doctor if she is going to need continuous narcotics." (Tr. at 383).

In September 2002, Claimant began seeing Dr. John Pellegrini at the Tri-State
Medical Center in Wayne, West Virginia and continued to treat with him through 2005.
(Tr. at 522-559). Although the records in evidence from Dr. Pellegrini's office do not
expressly document a prior treatment relationship with Claimant, they imply that he
saw her in the past for pain-related complaints. (Tr. at 559). He agreed to see Claimant

in 2002, but indicated that he would not give her any pain medications.   (*Id.*).   The records reflect that Claimant chronically complained of pain, including pain in the back, knee, hip, ankle, and stomach.   She repeatedly requested pain medications and reported various accidents and injuries to explain her pain.   (Tr. at 522-559).   In May 2003, Dr. Pellegrini ordered an MRI of Claimant's ankle due to her complaints of chronic pain. The MRI revealed no evidence of acute complications or internal derangement of the ankle.   (Tr. at 543).   There was no soft tissue edema, fluid collection, or acute osseous abnormality.   (*Id.*).   The tendons were unremarkable with no evidence of degeneration or tear.   (*Id.*).

In February 2004, Dr. Pellegrini referred Claimant to Dr. Glen Imlay, a pain specialist at Holzer Clinic.   (Tr. at 457-458).   Claimant complained to Dr. Imlay of pain in her low back and right leg.   After performing an examination, Dr. Imlay agreed to manage Claimant's chronic pain, but indicated that he was "uncomfortable with narcotic treatment considering her problems with another physiatrist in the clinic."   (Tr. at 458). On a follow up visit in May 2004, Dr. Imlay noted that Claimant's MRI films of her back did not reflect objective findings that explained her severe back pain.   (Tr. at 447).

In August 2004, Claimant was admitted to Cabell Huntington Hospital ("CHH") for a colonoscopy to investigate the cause of persistent abdominal pain, about which she had been complaining for "some time."   (Tr. at 475-476).   A CT scan done earlier in the month was normal.   (*Id.*). According to her treating physician, Dr. Douglas Henson, Claimant's pain upon admission seemed "out of proportion" to the findings on physical examination.   (Tr. at 778).   Dr. Henson performed the colonoscopy, which was normal. At discharge, Dr. Henson stated that Claimant "complained of excruciating rectal pain after the colonoscopy was performed but otherwise [was] tolerating a regular diet and

having normal bowel function."  He added, that when he "approached her about having her pain medicine switched to p.o. she tried to bargain with me to continue IV pain medicine and finally confessed that she probably does not need IV pain medicine at this time."  (*Id.*).   Dr. Henson felt there may be "some drug-seeking tendencies" underlying her complaints. (*Id.*).   An EGD performed by him later in the month showed only a mild gastritis with otherwise normal findings.  (Tr. at 492).

On November 15, 2004, Claimant presented to the Emergency Department at CHH complaining of abdominal pain and asking for pain medication.  (Tr. at 769-770). Upon examination, a consulting physician was suspicious of Claimant's complaints, commenting that Claimant complained diffusely of pain except when she was distracted. (*Id.*).   Nonetheless, he admitted Claimant to Dr. Henson's service.   (Tr. at 513-517). During this admission, Dr. Henson performed a diagnostic laparoscopy and discovered the existence of some adhesions, which he lysed.  Claimant was sent home on 5 days of pain medication.  (*Id.*).   Dr. Henson noted "the patient with probable psychiatric history will be instructed to follow up with her primary care physician."  (*Id.*).

On June 13, 2006, Claimant was transported by ambulance to SMMC after sustaining trauma in an ATV rollover.  (Tr. at 745-747).  She complained of back and neck pain.  (*Id.*).  At the time of discharge, her attending trauma surgeon, Dr. David Denning, indicated that Claimant had sustained a compression fracture of the lumbar spine, but surgery was not required. He noted that "[t]he patient did have specific demands regarding her pain control," which he had tried to accommodate.  (*Id.*). Claimant was discharged in a TLSO brace and was ambulatory at the time of her release.

Two days later, Claimant returned to the hospital stating that she could not walk. (Tr. at 740).  The examining physician noted that Claimant had an L2 fracture, but he

was clearly suspicious about the intensity of her complaints.  (*Id.*).  She did not meet admission criteria, so she was discharged.  (*Id.*).  Claimant continued to complain of back pain.

On July 20, 2006, Claimant when to Dr. Weinsweig's office and consulted with his partner, Dr. Rida Mazagri, who ordered another CT scan of the lumbar spine.  Based upon the results of the scan, which showed a burst fracture of the L2 with 50% loss of height, Dr. Mazagri suggested a surgical repair using interbody cages as well as a plate with screws.  (Tr. at 665-666).  The surgery was performed on September 5, 2006.  (Tr. at 648-649).  At an office visit on November 16, 2006, Dr. Mazagri stated that Claimant was doing well post-operatively, although she continued to complain of pain.  (Tr. at 674).  The incision was well-healed; Claimant moved her extremities well; and x-rays confirmed good placement of the hardware.  Dr. Mazagri advised Claimant to continue with physiotherapy and told her she could discontinue wearing her brace.  (*Id.*).

Also on November 16, 2006, Claimant presented to the Emergency Department at SMMC complaining of back pain.  (Tr. at 675-676).  The evaluating physician documented that Claimant had been a patient in the ED on prior occasions and had tested positive more than once for cocaine, opiates and cannabis. (*Id.*). The examination was essentially negative except for some tenderness at the L5-S1 area.  She was given pain medications and told to follow up with Dr. Mazagri and the Pain Clinic. (*Id.*).

Claimant did present to the Pain Clinic as instructed and was told to avoid going to emergency rooms and to take her medications as prescribed.  (Tr. at 671).  Her medication regimen was changed, so that her oxycodone intake would decrease and her OxyContin intake would increase.  (*Id.*).  Claimant returned to the Clinic regularly to receive OxyContin.  (Tr. at 706-710).

In March 2007, Claimant developed an incisional hernia in her back, which was surgically treated by Dr. Henson in June 2007. (Tr. at 726). Subsequently, she developed a left lateral abdominal wall abscess, which was drained at CHH. (Tr. at 728-731). She was discharged in stable condition on June 22, 2007. (*Id.*).

### B. Psychiatric Records

The records indicate that Claimant was referred to Prestera Center for Mental Health Services ("Prestera") in January 2001. (Tr. at 417). She repeatedly missed or canceled appointments, finally presenting for her initial visit in August 2001. (Tr. at 415). She agreed to begin psychotherapy and chemotherapy. (Tr. at 414). During the first six months of her therapy, she complained primarily of anxiety, panic attacks and depression. (Tr. at 409-413). On April 6, 2002, Claimant participated in a treatment plan review with her therapist and psychiatrist. (Tr. at 408). She described an increase in panic attacks and depression. The group decided on psychotherapy two times per month, with Xanax for medication support. (*Id.*). Her diagnosis on Axis 1 was Panic Disorder and Post Traumatic Stress Disorder. (*Id.*).

Claimant followed this treatment regimen, although during the first year and half of treatment, she kept only 14 out of 32 scheduled psychotherapy appointments. (Tr. at 396-407). On January 1 2003, Claimant's psychiatrist opined that Claimant's depression and anxiety were largely caused by her pain; therefore, she recommended that Claimant pursue pain management and delay psychotherapy sessions for a few months. (Tr. at 396).

On April 15, 2003, Claimant was evaluated by Nicole Wilson, a case worker, and Dr. Sohail Rana, a psychiatrist, at Prestera. (Tr. at 633-636). This evaluation was completed at the request of the West Virginia Department of Health and Human

Resources secondary to its review of Claimant's application for a medical card.  (*Id.*).   In the interview portion of the assessment, Claimant complained of frequent panic attacks, as many as 4 or 5 each day.  She indicated that she did not drive because the panic attacks came "out of the blue," making her concerned for her safety.  She told the interviewers that she had never been hospitalized for psychiatric illness, but had spent time at Prestera's Crisis Unit.  (*Id.*).  Claimant's mental status examination was essentially normal.  She was diagnosed with Panic Disorder without Agoraphobia, rule out cannabis abuse.  In the summary of their report, the interviewers remarked that given the large number of medical conditions reported by Claimant, "it is unclear how many of these conditions are real and how many are what [Ms. Crockett] thinks may help her get assistance."   However, they recommended that Claimant continue with psychiatric treatment "to aid in her battle with both physical and psychological issues." (*Id.*).

Claimant returned to psychotherapy on May 13, 2003 and began seeing Michael Nuce, M.A., a clinical psychologist at Prestera.  (Tr. at 632).  She continued to see Mr. Nuce through August 2003, followed by a couple of sessions with another Prestera psychologist.  (Tr. 620-632).  On August 4, 2003, Claimant reported to Dr. Nika Razavipour, a new psychiatrist assigned to Claimant's case, that her panic attacks were significantly better with Xanax, but without Xanax, she could not function.  (Tr. at 602). In November, 2003, Claimant told Dr. Razavipour that she was "having lot of stress." She reported that her husband was in jail for DUI, and she was having significant pain, causing her to experience anxiety.  (*Id.*).  Claimant continued her pattern of missing as many psychotherapy sessions as she attended.  (*Id.*).

On February 2, 2004, Claimant underwent a psychological evaluation, which included a client interview, a mental status examination, and a psychological/functional assessment. (Tr. at 603-619). Claimant was noted to be on chemotherapy, including Zoloft and Xanax. Her diagnosis was Panic Disorder without Agoraphobia, and her Global Assessment of Functioning Scale ("GAF") was 55.[6]   Her symptom acuity was severe for depression, hopelessness, agitation, poor concentration, and hostility; and moderate for anxiety, tearfulness, panic, insomnia, paranoia, withdrawal and impulsivity. (*Id.*).   In the five domains of function, Claimant self-assessed, and was considered by the therapist to have, moderate dysfunction in self-care; marked dysfunction in community living; marked dysfunction in social, interpersonal and family activities; marked dysfunction in concentration and task performance; and mild dysfunction in maladaptive, dangerous, and impulsive behaviors. (*Id.*).  Dr. Razavipour adjusted Claimant's medications, increasing her Zoloft.  (Tr. at 601).

On April 29, 2004, Claimant's medications were again adjusted.  The mental health professional at Prestera documented that Xanax was not a good choice for Claimant, because of her history of marijuana abuse and her failure to follow the recommendations of her therapist in the past.  (*Id.*).  The provider elected to refill the Xanax prescription subject to a tapering regimen.  Claimant was unhappy about the decision to taper her Xanax, but agreed to continue with therapy.  (*Id.*).

---

[6] The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100.  This rating tool is regularly used by mental health professionals and is recognized by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV.*  A score of 51-60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning.

On July 28, 2004, Claimant was evaluated by Lisa Tate, a licensed psychologist, at the request the Disability Determination Section.  (Tr. at 470-474).   Claimant reported depression and anxiety.  She claimed to have difficulty sleeping, feelings of hopelessness, depressed mood, crying spells and a withdrawal from activities.  (*Id.*)  Ms. Tate performed a mental status examination, noting that Claimant's mood was dysphoric and her affect was "mildly restricted," but her thought processes appeared logical and coherent; she was alert and oriented; and her judgment, memory and psychomotor behavior were all within normal limits. (*Id.*)   Ms. Tate concluded that Claimant's attention and concentration were mildly deficient, but her social functioning, persistence, and pace were normal. Ms. Tate diagnosed Claimant with Dysthymic Disorder and Panic Disorder without Agoraphobia.  She felt that Claimant had a "fair" prognosis. (*Id.)*

On September 13, 2004, the providers at Prestera performed another assessment of Claimant and completed the "West Virginia Assessment: Version 6 Care Connection Form."  (Tr. at 589-598).   In an interpretive summary note, Claimant's case worker stated that Claimant reported depression, irritability, and panic episodes that occurred several times each day.   (Tr. at 589).   Claimant indicated that she had poor concentration, was distractible, and had poor appetite and sleep patterns.  Claimant complained of her physical pain and was "advocating" for Xanax.  (*Id.*).  She told the case worker that she could not deal with other people, feeling agitated and irritable around them.   The therapist discussed Claimant's concerns regarding medication dependency. (*Id.*).   According to the assessment form, Claimant was taking an antidepressant, Zoloft, and a mood stabilizer, Topamax.  (Tr. at 590-598).  She was also taking Klonopin for anxiety.  (*Id.*).  Claimant admitted to having chronic depression,

anxiety and panic attacks. (*Id.*). However, she denied receiving inpatient psychiatric services or substance abuse counseling. On this date, the acuity of her panic and depression was considered to be moderate, while her anxiety acuity was severe. (*Id.*) In the five domains of function, Claimant self-assessed, and was considered by the therapist to have, mild dysfunction in self-care; moderate dysfunction in community living activities; moderate dysfunction in social, family, and interpersonal activities; moderate dysfunction in concentration and task performance; and no dysfunction in maladaptive, dangerous and impulsive behaviors. (*Id.*). Overall, her Global Assessment of Functioning Scale ("GAF") was again assessed to be 55.

On the same day, Dr. Razavipour conducted a psychiatric evaluation. (Tr. at 587-588). Dr. Razavipour diagnosed Claimant with Panic Disorder without Agoraphobia and rule out Bipolar Disorder. (*Id.*). She prescribed Klonopin, psychotherapy, and a neurology consult to "rule out seizure [disorder]/due to aura before panic attacks and confusion after attacks," which Dr. Razavipour thought might be indicative of a postictal state.

On December 6, 2004, Dr. Razavipour and Debra Stephens, Claimant's therapist, wrote a letter to the West Virginia Department of Health and Human Resources, indicating that Claimant had several panic attacks each day. (Tr. at 585). They suspected that Claimant also had a mood disorder and might be bipolar. (*Id.*). According to these providers, Claimant "would be an unlikely candidate for work for the next six months to a year, depending on finding medication that effectively treats her symptoms and her ability to cope with her stressors emotionally and behaviorally." (*Id.*).

On July 24, 2006, Prestera completed an updated assessment of Claimant.  (Tr. at 683-696).  Claimant's therapist documented that Claimant reported being depressed and anxious with explosive behavior and weight gain.  Claimant further stated that she was hearing voices telling her to do things.  (*Id.*).  She complained of being more irritable, of wanting "to hurt people," and of having increased issues with poor concentration and memory. (*Id.*).  She was diagnosed with Panic Disorder without Agoraphobia and her GAF scale was 50, placing her in the category of "serious symptoms OR any serious impairment in social, occupational, or school functioning."[7] On this same date, Ms. Stephens and Dr. Razavipour wrote a second letter reporting that Claimant was "experiencing mood difficulties and anxiety problems in such a degree that she is not currently able to be successfully employed."  (Tr. at 580).  They indicated that Claimant's "social interpersonal interactions would be primarily of concern due to explosive nature when triggered."  (*Id.*).  Claimant refused psychotherapy, but continued to see the psychiatrists at Prestera for medication. (Tr. at 680- 682).

In the course of evaluating Claimant's application for SSI, the SSA retained Dr. James Capage on two separate occasions to complete a Psychiatric Review Technique and a Mental Residual Functional Capacity Evaluation.  (Tr. at 427-444, 560-577).  In his first review, completed on June 23, 2003, Dr. Capage stated that Claimant's "mental impairments do not meet or equal the Listings.  They do impose moderate limitations upon functioning as reflected by the ratings of Part I.  It seems that she retains the mental-emotional capacity to perform routine tasks in a low-pressure setting."  (Tr. at

---

[7] *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV.*  American Psychiatric Association.

443).  In his second review, completed on March 1, 2005, Dr. Capage opined that "the claimant has severe mental impairments that do not meet nor equal the Listings."  He reiterated that these impairments imposed moderate limitations on functioning, but Claimant could still perform routine work-related activities in a low pressure setting. (Tr. at 576).

## VII.  <u>Analysis</u>

### A.      <u>Failure to Consider and Weigh Treating Source Opinions</u>

Claimant contends that the ALJ erred by failing "to mention or explain the weight" he gave to the opinions of Claimant's treating mental health professionals and by implicitly giving controlling weight to the opinion of a non-examining agency expert. (Pl. Br. at 14).  The undersigned agrees.

Title 20 U.S.C. § 416.927(d) outlines how medical opinions will be weighed in determining whether a claimant qualifies for SSI benefits.  In general, the SSA will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source.  *See* 20 C.F.R. § 416.927(d)(1).  Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. § 416.927(d)(2).  Indeed, a treating physician's opinion will be afforded controlling weight if two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) it is not inconsistent with other substantial evidence."  *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also,* 20 C.F.R. § 416.927(d)(2) (2002).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. § 416.927(d)(2). If the ALJ

determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 416.927(d)(2)-(6).  These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors.  "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator."  SSR 96-2p.  When a treating source's opinion is not given controlling weight, and the opinions of agency experts are considered, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources. . ." 20 C.F.R. § 404.927.

In order for a claimant to understand (1) why a treating source's opinion was not given controlling weight and (2) how the opinion was used by the Commissioner in reaching his determination, the SSA represents that it "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 416.927(d)(2).  In Social Security Ruling 96-2p, the SSA further elucidates its obligation to explain the weight given to a treating source's medical opinion (i.e. on the nature and severity of an individual's impairment), stating as follows:

> When the determination or decision: * is not fully favorable, e.g. is a denial. . .the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight.

*Id.* at 4.

Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions. 20 C.F.R. 404.927(e). In both the aforestated regulation and Social Security Ruling 96-5p, the SSA addresses how medical source opinions are considered when they encroach upon these "reserved" issues; for example, opinions on "whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (the listings); what an individual's residual functional capacity (RFC) is;. . . . and whether an individual is 'disabled' under the Social Security Act. . ." Opinions concerning issues reserved for the Commissioner are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." SSR 96-5p at 2. However, these opinions must always be carefully considered and "must never be ignored." *Id.* Moreover, for "treating sources, the rules also require that [the SSA] make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear. . ." *Id.* Equally as important as the duty to carefully consider these opinions is the duty of the ALJ in his decision to "explain the consideration given to the treating source(s) opinion." SSR 96-5p at 1. As stated in the Ruling, "[a]djudicators **must** weigh medical source statements

under the rules set out in 20 CFR 404.1527 and 416.927, **providing appropriate explanations for accepting or rejecting such opinions.**" SSR 96-5p at 4. (emphasis added).

As Claimant emphasizes in her brief, her treating psychiatrist at Prestera, Dr. Nika Razavipour, co-authored two letters during the relevant time period opining that Claimant was unable to work due to the severity of her psychiatric conditions. (Tr. at 580, 585). In addition, Claimant produced other psychological assessments and records from Prestera that documented the existence and severity of her psychiatric conditions, detailing some of the functional limitations flowing from those conditions. The ALJ clearly reviewed these records, as he commented on them in his analysis of the severity of Claimant's impairments, even finding her psychiatric conditions of Panic Disorder and rule out Bipolar Disorder to be "severe impairments." (Tr. at 20-21). Yet, without explanation, when evaluating the degree of severity of Claimant's psychiatric impairments, the ALJ relied almost exclusively on the findings of Lisa Tate, a consultative psychologist who performed a single evaluation on Claimant. (Tr. at 22-23). The ALJ made no mention of the records from Prestera or of the written opinions of Dr. Razavipour, which substantially differed from the findings of Ms. Tate. *Id.* If the ALJ did, in fact, carefully consider the Prestera opinions at this step in the sequential evaluation, he was silent as to the weight he gave to those opinions.

Discussion pertaining to the evaluations, session notes, and opinions generated by the Prestera professionals also was absent in the ALJ's analysis of Claimant's residual functional capacity. (Tr. at 23-27). The determination of a claimant's RFC is an issue reserved for the Commissioner; however, the SSA confirms that, when evaluating a claimant's RFC, it will "use medical sources, including your treating source, to provide

- 24 -

evidence, including opinions, on the nature and severity of your impairments." 20 C.F.R. § 416.927(e)(2). "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p at 6. If conflicting medical evidence or opinions are present in the record, the ALJ must resolve the conflict, *Diaz v. Chater,* 55 F.3d 300 (7th Cir. 1995), by weighing the medical source statements, again "providing appropriate explanations for accepting or rejecting such opinions." 20 C.F.R. § 416.927. "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir. 1996), citing to *Vincent ex rel. Vincent v. Heckler,* 739 F.2d. 1393 (9th Cir. 1984). "A minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984).

Here, the ALJ only partially fulfilled his obligation. He thoroughly addressed and rejected a one paragraph opinion prepared by Claimant's treating neurosurgeon, which opined that Claimant would be "temporarily totally disabled" from September 5, 2006 through December 5, 2006. However, he inexplicably ignored the similar letters written by Dr. Razavipour, as well as the functional assessments completed by the Prestera providers. (Tr. at 23-27). The ALJ never supplied any rationale for why he apparently discredited the Prestera opinions, nor explained what weight, if any, he gave to them. These oversights directly contravene the evaluation process required by the social security regulations and leave this Court without a basis upon which to review the appropriateness of the Commissioner's ultimate determination. In the absence of

findings by the ALJ, which are sufficiently explained and reasonably supported by a specific weighing of the evidence, the undersigned cannot verify that the ALJ's conclusions were based upon substantial evidence.

In this case, Prestera had been the Claimant's primary psychiatric treating source since 2001 and had created substantial records documenting Claimant's symptoms and functional limitations related to her mental health impairments.  However, the ALJ barely mentioned the assessments, notations, and opinions of Prestera and provided no insight to how he weighed and considered them in reaching his decision.  He apparently adopted the findings of Dr. Capage, the non-examining agency source, in determining Claimant's RFC, but provided no rationale for his determination that those findings were more reliable than the opinions expressed by the Prestera professionals.  Likewise, the ALJ failed to comply with the Administration's rulings and the case law that required him to expressly comment on medical opinions that conflicted with the RFC findings.

Accordingly, the undersigned proposes that the presiding District Court **FIND** that the ALJ erred by failing to properly consider and weigh the opinions of Claimant's mental health care providers and further erred by failing to articulate his reasons for discounting or rejecting those opinions, as required by the social security regulations.

### B.    Credibility Assessment

Claimant next argues that the ALJ relied upon incomplete information and ignored objective medical findings when reaching his conclusion that Claimant was "not entirely credible" in her descriptions of the severity, intensity, and persistence of her pain. In response, the Commissioner asserts that Claimant's drug-seeking behavior, not legitimate medical conditions, is the driving force behind her unceasing complaints,

pointing to voluminous medical records that verify Claimant's addiction to narcotics. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, make determinations as to credibility, or substitute its own judgment for that of the Commissioner." See *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

When making a credibility assessment of a claimant's allegations of pain, the ALJ must examine "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual." SSR 96-7p.  The ALJ is prohibited from rejecting a claimant's allegations of pain **solely** on the basis that the pain is not substantiated by objective medical evidence, but may consider the lack of objective evidence or other corroborating evidence as factors in his decision. *Craig v. Chater,* 76 F.3d. 585 (4th Cir. 1996).

In the instant case, the ALJ provided a detailed explanation for his credibility assessment, identifying specific pieces of evidence that caused him to question Claimant's veracity.  (Tr. at 26).  A review of the evidence reveals that the ALJ's credibility assessment is supported by substantial evidence.  The records unquestionably document significant narcotics abuse by Claimant.  Claimant's single-minded pursuit of pain medication certainly suggests the cravings of drug dependence rather than an irrefutable attempt to find pain relief.  Interspersed in the medical records are

numerous entries in which treating physicians questioned the legitimacy of Claimant's alleged pain, as well as entries documenting the suspicions of these physicians that Claimant intentionally harmed herself in order to obtain narcotics.   Several of her treatment relationships ended, because her physicians rendered care that should have reduced or eliminated her complaints, yet her alleged pain persisted, impervious, unaltered in its intensity and severity.   Even one of her own treating mental health professionals suggested that Claimant tailored her complaints and symptoms in order to get assistance.  (Tr. at 636).

Undoubtedly, the plethora of recorded skepticism and mistrust expressed by Claimant's treating physicians, alone, provide sufficient grounds for the ALJ to doubt Claimant's assertions of severe and unrelenting pain.   However, the ALJ also relied upon Claimant's descriptions of her daily activities, noting that these reports intimated physical abilities that were inconsistent with Claimant's allegations of debilitating pain. (Tr. at 26).   For example, Claimant indicated that she could do a range of housework, including the laundry, run errands, go grocery shopping and visit with friends.  (*Id.*). These activities would have been extremely difficult in the presence of severe pain. In addition, the ALJ observed that Claimant had not been entirely reliable in detailing her medical history, claiming that she had attention deficit and hyperactivity disorder when no medical record substantiated the existence of this condition. (*Id.).* The ALJ implied that this testimony was indicative of Claimant's tendency to exaggerate the extent of her impairments.   Contrary to Claimant's contention, the ALJ did articulate a sound basis for questioning Claimant's credibility and finding that she was "not entirely credible." Therefore, the undersigned respectfully proposes that the presiding District Court

**FIND** that the Commissioner's assessment of Claimant's credibility was supported by substantial evidence.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court:

(1) **GRANT** plaintiff's Motion for Judgment on the Pleadings (Docket No. 13);

(2) **DENY** defendant's Motion for Judgment on the Pleadings (Docket No. 15);

(3) **REVERSE** the final decision of the Commissioner;

(4) **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings on the issue of the weight to be given to the opinions of Claimant's treating mental health care providers; and

(5) **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure. The defendant shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** December 29, 2010.

Cheryl A. Eifert
United States Magistrate Judge